**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Michael Balow,

*Plaintiff,*

v.

Brianna Scott, in her official capacity as Chair of the Michigan State University Board of Trustees; and Stefan Fletcher, in his official capacity as Secretary and Chief of Staff to the Michigan State University Board of Trustees,

*Defendants*.

Civil Action No.: _____________

**VERIFIED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS**

JURY TRIAL DEMANDED

GREG HAROLD GREUBEL
IA Bar No. 201452; PA Bar No. 321130; NJ Bar No. 171622015; CA Bar No. 343028
HEATHER PINCUS
New York Bar No. 6324255
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)
510 Walnut Street; Suite 900
Philadelphia, PA 19106
Tel: (215) 717-3473
greg.greubel@fire.org
heather.pincus@fire.org

ROB EDWARDS
D.C. Bar No. 90027477
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
rob.edwards@fire.org

BRANDON M. GRYSKO
Michigan Bar No. P82751
FAUSONE & GRYSKO, PLC
41700 West Six Mile Road, Suite 101
Northville, MI 48168
Tel: (248) 912-3240
bgrysko@thefgfirm.law

*Counsel for Plaintiff Michael Balow*

## INTRODUCTION

1. History teaches that self-government breaks down when those in power use governmental authority to silence dissent. This case concerns the Michigan State University Board of Trustees, which recently enacted a speech code prohibiting its members from speaking openly about MSU's leadership. Under the Board's new rules, trustees may praise MSU's leadership all they want, but they face sanctions if they publicly criticize it. That is blatant viewpoint discrimination, repugnant to our Constitution and political tradition.

2. Plaintiff Michael Balow is an elected member of MSU's Board of Trustees suing to vindicate his constitutional rights. The First Amendment requires that elected officials like Balow receive "the widest latitude to express their views on issues of policy." *Bond v. Floyd*, 385 U.S. 116, 135–36 (1966). And yet, a majority of MSU's Board is forcing Balow to promise not to criticize the University and its leadership, or else lose the resources he needs to do his job.

3. In 2024, Michigan voters elected Balow to MSU's Board with a mandate to increase oversight at the University, which for years had been plagued by scandal and dysfunctional leadership. Since taking office, Balow has written op-eds, provided interviews, and issued other public remarks to question whether MSU's administration prevented the Board from properly vetting a $100 million athletics deal and to criticize the University's failure to investigate the institutional breakdowns that allowed the Larry Nassar sexual abuse scandal to occur.

4. But Defendant Board Chair Brianna Scott does not want the public to hear what its elected trustees really think about how MSU is run. In a hastily called meeting, the Board revised its Code of Ethics and Conduct (the "Ethics Code") to punish trustees who publicly criticize Board decisions or university leadership. Trustees who violate the revised Ethics Code are subject to sanctions, including potential removal from office.

5. The revised Ethics Code requires Balow and his fellow trustees to "uphold the university's reputation," prohibits "inaccurate, misleading, or false information concerning the university," directs trustees to "support" and not "undermine" majority Board decisions, and requires "loyal opposition," raised only in "appropriate settings" (collectively, the "Trustee-Speech Restrictions").

6. As a means of enforcement, the Ethics Code requires each trustee to agree to the Trustee-Speech Restrictions by signing a "Statement of Acknowledgment." If a trustee refuses to sign, the Ethics Code requires the Board to censure the trustee and revoke the resources, access, and assignments otherwise afforded to Board members to carry out their official duties.

7. Balow has refused to sign the statement because he objects to the limitations the Trustee-Speech Restrictions place on his speech as an elected trustee. Defendants have responded by censuring Balow, excluding him from University events, and withholding funds intended to support his work.

8. The Ethics Code forces Balow to either surrender his First Amendment rights or forfeit resources associated with his office. This violates settled law that the Board "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

9. To protect his First Amendment right to speak and the rights of Michigan voters to hear him, Balow brings this lawsuit to enjoin the Board's enforcement of the unconstitutional Trustee-Speech Restrictions and the unconstitutional condition the Statement of Acknowledgment imposes on Balow's access to resources. Defendants' enforcement of those requirements is causing Balow ongoing, irreparable harm by impeding his ability to fulfill the official duties of his office. Balow therefore seeks preliminary and permanent injunctive relief, as well as declaratory relief.

## JURISDICTION AND VENUE

10. This action arises under the First and Fourteenth Amendments to the United States Constitution. Balow brings this action under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

11. This Court has original jurisdiction over Balow's constitutional claims under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3) (civil rights jurisdiction).

12. Venue is proper in the Western District of Michigan under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Balow's claims occurred within this District.

## THE PARTIES

13. Plaintiff Michael Balow is a resident of Wayne County, Michigan. He is a Navy veteran with decades of experience in commercial real estate development, sales, and leasing.

14. Michigan voters elected Balow to the MSU Board of Trustees in November 2024. He campaigned for his Board position on a platform emphasizing institutional transparency, oversight, and accountability. Since taking office as an elected trustee, Balow has at times been critical of MSU's leadership and certain actions by the Board of Trustees, and he desires to speak openly about issues of public importance. His eight-year term runs until January 1, 2033.

15. Defendant Brianna Scott currently serves as Chair of the MSU Board of Trustees. In that capacity, Scott reviews trustee expenses for reimbursement.

16. Scott is therefore responsible for enforcing sanctions under the Board's Ethics Code, which renders trustees who refuse to execute the Statement of Acknowledgment assenting to the Trustee-Speech Restrictions ineligible to receive travel funding and any expense reimbursements other than those necessary to attend formal Board meetings or work sessions.

17. Scott also serves as Chair of the Board's Audit, Risk and Compliance Committee. In that capacity, Scott is responsible for evaluating alleged violations of the Ethics Code and, if a violation is found, imposing penalties ranging from censure to referral to the governor for potential removal.

18. Defendant Stefan Fletcher currently serves as the Secretary and Chief of Staff of the MSU Board of Trustees. In that capacity, Fletcher is primarily responsible for enforcing sanctions under the Ethics Code.

19. Upon information and belief, Scott and Fletcher have personally denied Balow reimbursement for expenses necessary to fulfill his official duties, excluding him from university events, and removing other resources of his office.

20. Balow sues both Scott and Fletcher in their official capacities.

## FACTUAL ALLEGATIONS

***Michigan State University and Its Governance***

21. Michigan State University is a public land-grant university in East Lansing, Michigan.

22. The Michigan Constitution creates an eight-member MSU Board of Trustees and vests it with general supervisory authority over MSU, including the power to control the university's funds and elect its President, who serves at the pleasure of the Board.

23. Michigan voters elect individual trustees to staggered eight-year terms on the Board. Trustees are ultimately accountable to the public—not to the university's administration.

24. The Board's Bylaws charge trustees with assuring that MSU has "the financial and other resources necessary [for] the successful performance of its mission." MICH. STATE UNIV. BD. OF TRS. BYLAWS pmbl. (rev. Sept. 11, 2026), https://perma.cc/63XK-72ZR (hereinafter "BYLAWS"). Trustees therefore pledge they will persuade "their fellow citizens … the

Legislature[,] elected state officials, and … the federal government … of the essential importance of the University's mission." *Id.*

25. As required under Michigan law, article 1 of the Board's Bylaws provides that trustees shall serve "without compensation, but shall receive the actual and necessary expenses incurred by them in the performance of the duties of their office." BYLAWS art. 1; Mich. Comp. Laws § 390.103.

26. The Board's practice demonstrates that "actual and necessary expenses," *id.*, include activities where trustees advocate for the University's interests, hear from stakeholders, and develop expertise in university governance, and cover the airfare or mileage reimbursement, per diem, and hotel stays. In other words, necessary expenses extend beyond the costs trustees incur for attending Board meetings.

27. The Board customarily covers the costs of trustees' attendance at leadership events, such as the Mackinac Policy Conference, and at professional development programs, such as those hosted by the Association of Governing Boards of Universities and Colleges (the "Association of Governing Boards").

28. Attendance at such events is essential to a trustee's ability to serve the Michigan voters who elected them and to effectively perform their fiduciary duties to MSU by providing educational and relationship-building opportunities.

29. As statewide elected officials, trustees must hear from and speak with Michigan citizens, policymakers, and members of the MSU community so they can represent those constituents' interests in Board decisions, and each trustee must account to voters for how he or she carries out the duties of their office.

30. Leadership conferences, for example, present prime opportunities for trustees to fulfill their duty to persuade "the Legislature and elected state officials, and … the federal government … of the essential importance of the University's mission." BYLAWS pmbl. Leadership conferences also provide trustees with opportunities to hear directly from local, state, and national policymakers regarding policy issues relevant to the Board's decision-making.

31. Furthermore, attending professional-development programs equips trustees with valuable training on policy issues affecting higher education and proven practices in university governance.

32. The Board also pays for trustees to attend MSU-sponsored events to engage with the University community, including at athletic competitions, school ceremonies, and social events.

33. Attending MSU-sponsored events such as ceremonies, fundraisers, and athletic competitions is a critical part of serving on MSU's Board and the Board member's general oversight role under Michigan's Constitution. Trustees need these events to meet, listen to, and speak candidly with the people most affected by Board decisions—including the constituents who hold them accountable at the ballot box.

34. The Trustee Taxation Guidelines for Tickets and Travel recognizes that "the University benefits when Trustees function as its advocates with government officials, business and labor leaders, alumni, donors, members of the media, and Michigan's citizens. Trustees attend many University events, both on and off campus, to engage in such advocacy and to fulfill their other duties as Board members." *See* Exhibit A (MSU Trustee Taxation Guidelines for Tickets and Travel).

35. MSU routinely reimburses trustees for the cost of attending athletic events. According to a recent report, since 2023 the Board has expensed $77,509 in travel to sporting events—more than half of the $151,194 the Board spent on all trustee travel, including travel to Board meetings and other university functions. Julia Roeder, *Free travel, occasional seats to MSU sports a perk for unpaid trustees*, THE STATE NEWS (Mar. 27, 2026), https://perma.cc/B275-75CR.

36. And because donors and alumni also attend MSU-sponsored events, trustees regularly attend in furtherance of their duties to ensure MSU has "the financial and other resources necessary [for] the successful performance of its mission" and to persuade "their fellow citizens … of the essential importance of the University's mission." BYLAWS pmbl.

37. Defendant Scott has emphasized the importance of trustees attending sporting events, writing: "As members of the Board of Trustees, it is our privilege to attend a variety of events, including sporting events, engaging with student organizations, community outreach opportunities on behalf of MSU, conferences to help expand our skills in support of the university, and campus events that highlight the many contributions of rich and varied communities that make MSU their home." Roeder, supra ¶ 35.

38. Vice President of Communications Emily Guerrant said attending games is a part of a trustee's duties, explaining that "[w]hen Board members do travel for a game or an event, there's often also another event. It's not just a game, there could be an alumni gathering, fundraising event or meeting with donors." *Id.*

39. Finally, the preamble to the Board's Bylaws addresses the public to whom trustees are ultimately accountable: "With respect to the people of Michigan, the board willingly acknowledges that this University is in the final analysis their University." BYLAWS pmbl.

40. The Bylaws therefore proclaim that the University "must encourage the timely discussion in open forum of a wide variety of issues, some of which are bound to be controversial" and that "any restraints on the freedom of expression at the University must be limited to measures to protect such free inquiry[.]" *Id.*

***Balow's Election to MSU's Board of Trustees***

41. When running for office, Balow criticized what he regarded as excessive secrecy surrounding University governance and called for greater openness by the MSU Board and administration. A central theme of the campaign was "Transparency and Fairness in Decision Making." Balow declared that there should be "[n]o more boardroom secrets at MSU" and urged fuller disclosure concerning matters of institutional importance.

42. More specifically, Balow criticized MSU's response to the Larry Nassar scandal, in which Nassar, an MSU sports physician, sexually abused hundreds of young women and girls over two decades, leading MSU to reach a $500 million settlement with Nassar's victims.

43. Balow publicly supported MSU's release of remaining records concerning its handling of the Nassar matter and the completion of an independent investigation into the same.

***Public Disagreement Among Trustees***

44. About a year and a half into Balow's term, public disagreements began to emerge among MSU trustees.

45. In April 2026, Balow circulated to the Board and MSU President Guskiewicz a signed memorandum calling for an investigation concerning MSU's General Counsel, Brian Quinn. The memorandum criticized Quinn's handling of multiple past issues. It faulted him for failing to give trustees access to important documents, including the unredacted version of documents concerning Nassar, and the Office of General Counsel's interference in independent Title IX investigations.

46. Balow requested that the Board meet privately with President Guskiewicz to discuss these concerns, but Guskiewicz and Board Chair Scott refused to hold such a meeting.

47. *The State News*—a news site dedicated to covering MSU—reported on the memorandum in an article published April 11, 2026. Alex Walters & Owen McCarthy, *Trustees have "serious concerns" about Quinn*, THE STATE NEWS (Apr. 11, 2026), https://perma.cc/8X99-UMBC.

48. Twelve days after *The State News* reported on the memorandum, Balow and Denno published an op-ed in *The Detroit News*, "To maintain trust, proper oversight at MSU is required," that described the athletics department's revenue-generating proposal as a series of agreements involving two newly created entities, "Spartan Ventures" and "Spartan Media Ventures," with a $100 million investment into the latter entity in exchange for a minority stake in MSU's athletics revenues. Mike Balow & Dennis Denno, *To maintain trust, proper oversight at MSU is required*, THE DETROIT NEWS (Apr. 23, 2026), https://perma.cc/PCT6-794B.

49. In their April 23 op-ed, Trustees Balow and Denno wrote that when the Board was asked to approve one of the agreements, trustees were improperly denied access to legal documents they needed to examine the effects of that $100 million investment. Specifically, they wrote that the Board had been denied "information such as minimum guaranteed returns and important buy/sell provisions, which can further dilute MSU's ownership of the athletics department revenue stream, which will exceed $200 million annually." *Id.*

50. Balow and Denno explained that "[w]hile we support our MSU leadership team, trust alone is no way to conduct oversight at a major university with a multibillion-dollar budget," and that "board members cannot be denied their ability and duty to conduct proper oversight." *Id.*

51. Trustees Balow and Denno subsequently discussed the same athletics-oversight issue in an interview on a podcast dedicated to university governance that aired on May 10, 2026. TRUSTEES AND PRESIDENTS: A PODCAST FOR UNIVERSITY LEADERS ON COLLEGE ATHLETICS: *Trustees Can't Do The Job They Are Told To Do: Michigan State's Battle Over College Athletics Oversight* (Apple Podcasts, May 10, 2026), https://perma.cc/3YF8-LTR4.

***Trustee-Speech Restrictions in the Board's Revised Ethics Code***

52. One week after the podcast episode became publicly available, the MSU Board held a special meeting in which it enacted revisions to its Ethics Code.

53. On information and belief, Board members called the special meeting in response to the recent criticisms by trustees. The meeting took place virtually on the evening of Sunday, May 17, 2026.

54. During the special meeting, Defendant Scott stated that some trustees had been "undermining the president, the administration, and decisions made by this board" and "spreading misinformation" via "podcasts, op-eds, [and] inappropriate email messages." *See* Exhibit B (May 17, 2026 Board Meeting Minutes) at 4, 22–23. Scott asserted that the conduct "has got to stop." *Id.* at 4.

55. As an example of speech that could violate the Ethics Code, Scott said that "an inaccurate version of the resolution we are voting on tonight, that was leaked in advance on purpose" was "creating a very false narrative on what we are doing with our Code of Ethics and Conduct." *Id.*

56. While Scott claimed the Ethics Code was not about "suppressing speech," she told the Board that something needed to be done because "our president is frustrated." *Id.*

57. Scott further justified the Ethics Code as necessary "to foster an environment where [the president] can be successful in his leadership and his vision for Michigan State University." *Id.*

58. Trustee Rebecca Bahar-Cook likewise asserted that Board members should address disagreements in Board meetings, and criticized trustees for "relitigating" issues after the Board votes. *Id.* at 9.

59. The Board then approved a Resolution revising its Ethics Code. *See* Exhibit C (Resolution and Edits to Ethics Code).

60. The Resolution passed five to three. Balow voted against the Resolution, along with Trustees Denno and Vassar. Ex. B at 13–14.

61. Balow immediately objected to the Resolution during the special meeting as highly unusual and procedurally improper. He called it an "abomination of a university policy" that was placed on the agenda on a Sunday night without going through the Board's ordinary committee process, and he told the Board, "I object to the content of this resolution." *Id.* at 4–5.

62. Balow stated that the Resolution was "absolutely an assault on the First Amendment rights of any person who's serving in any sort of elected capacity, and an assault on the governance capability of those of us who might be in the minority at any given time." *Id.* at 4.

63. Balow explained that the Resolution forbids trustees from speaking out if the majority considers their speech "negative" or "offensive," and that it "offers immediate sanction." *Id.* at 4–5. In his words, the Resolution "leaves wide latitude to the majority of the Board to silence the minority at any given time." *Id.* at 5.

64. The May 17, 2026 revisions were the first revisions to the Ethics Code since its adoption in May 2020.

65. Prior to those revisions, the Ethics Code's only restrictions on trustee speech concerned (1) limitations on trustees' disclosure of confidential information, such as student records, privileged attorney-client communications, and non-public personnel or financial information; and (2) limitations to ensure that trustees did not improperly represent themselves as speaking on behalf of the entire Board.

66. But the May 17 revisions introduced Trustee-Speech Restrictions intended to limit trustees' public criticism of University governance issues.

67. As revised, paragraphs 9–10 of the Ethics Code require trustees to "uphold the university's reputation" and prohibit sharing "inaccurate, misleading, or false information concerning the university." *See* Exhibit D (Revised Ethics Code) at Trustee Ethics and Conduct Standards, ¶¶ 9–10.

68. The Ethics Code further commands that "when the Board speaks through majority action, we will not undermine and will support the majority decision of the Board[.]" *Id.* ¶ 10.

69. The Ethics Code also instructs trustees to "embrace the principle of loyal opposition and raise issues of concerns [*sic*] in appropriate settings, in advance of Board action, and protective of the integrity of the Board's deliberations and processes." *Id.* ¶ 11.

70. As Scott explained during the meeting, the Trustee-Speech Restrictions are designed to, and do, prohibit trustees from publicly criticizing MSU's President and any actions he or the Board takes.

71. The Trustee-Speech Restrictions' ban on "inaccurate, misleading, or false information" does not define the operative terms or provide any guidance to the Board as the enforcer regarding what speech the policy makes actionable. *Id.* ¶ 9.

***How Defendants Enforce the Trustee-Speech Restrictions***

72. The revised Ethics Code includes two enforcement mechanisms designed to coerce trustees' compliance with the Trustee-Speech Restrictions.

73. First, the Ethics Code mandates each trustee to execute an unaltered Statement of Acknowledgment each year that the trustee serves on the Board. Ex. D ¶ 15.

74. Trustees who refuse to sign the Statement of Acknowledgment by the deadline face a formal, public censure and automatic removal of specified resources and opportunities, including:

- "Immediate suspension from attending, in a trustee's representative capacity, any Michigan State University, and or College level sponsored events, programs, or ceremonies that do not involve formal Board action or the presence of a Board quorum. This restriction specifically encompasses ceremonial, social, or celebratory activities, including but not limited to, honorary degree ceremonies, faculty award dinners, student organization galas, and university-affiliated holiday or social gatherings and the like."

- "Immediate suspension of all discretionary travel budgets, including funding for professional development, seminars, or 'non-essential' conferences."

- "Immediate prohibition from accessing university-managed hospitality areas, including the MSUFCU Club or any other VIP lounges, during any university events."

- "Strict restriction of travel expense reimbursements to only those expenses absolutely necessary to attend in-person official, voting Board meetings or work sessions."

- "Immediate prohibition from representing the Board or the University at functions that do not involve formal Board action or business, including, but not limited to, donor galas, alumni 'Green and White' events, student organization celebrations, and community outreach initiatives and the like."

- "Immediate removal from all official speaking programs, commencement platforms, and groundbreaking ceremonies."

- "Immediate revocation of complimentary tickets to all home and away athletic events, including all suite access privileges."

- "Immediate suspension of all travel privileges, accommodations, and credentials for pre-season, in-season and post-season tournaments (including, but not limited to, bowl games and NCAA tournament travel)."
- "The non-compliant Trustee shall be removed immediately from any Board or committee leadership positions (e.g., Chair or Vice-Chair roles) and all external liaison assignments."

Ex. D, Sanctions for Failure to Comply with Statement of Acknowledgment Provision.

75. These sanctions remain in effect "until the non-compliant Trustee executes the unaltered and unedited document. Once the document is submitted, the automatic sanctions and protective measures will lift upon the Secretary of the Board certifying compliance with the Statement of Acknowledgment requirement." *Id.* (final paragraph).

76. The second enforcement mechanism applies to all trustees regardless of whether they sign the Statement of Acknowledgment: Any trustee suspected of violating one of the Trustee-Speech Restrictions is subject to investigation by MSU's Office of Audit, Risk and Compliance ("OARC"), which is empowered to deliver a report to the Board's Trustee Committee on Audit, Risk and Compliance. Ex. D, Reporting and Enforcement.

77. If the Trustee Committee on Audit, Risk and Compliance determines that a trustee's speech violated the Ethics Code, it may impose sanctions, including not only formal censure and removal of the resources described above, but also referral to the Michigan Governor or Michigan Legislature for removal from office. *Id.*

78. While the Ethics Code labels the resources trustees stand to lose as "non-essential," Ex. D, Sanctions for Failure to Comply with Statement of Acknowledgment Provision § 2, they are not mere perks—to the contrary, MSU provides trustees these resources because they are necessary to fulfill their official responsibilities as elected stewards of the University.

***Controversy Regarding the Trustee-Speech Restrictions***

79. During the same meeting in which the Board adopted the Trustee-Speech Restrictions, the Board also approved a salary increase of nearly $1 million for MSU's President, Kevin Guskiewicz.

80. The Board adopted the salary increase and the Trustee-Speech Restrictions to persuade Guskiewicz, who was considering employment offers from other universities, to stay at MSU.

81. Despite the Board's attempt to placate President Guskiewicz, ten days after the Board adopted the Trustee-Speech Restrictions, Guskiewicz announced his intention to leave MSU to become the President of Clemson University. Guskiewicz made the announcement in a message from his official MSU email in which he also criticized certain trustees. Kevin M. Guskiewicz, *A Message to the Spartan Community*, MICH. STATE UNIV. OFF. OF THE PRESIDENT (May 27, 2026), https://perma.cc/G25A-4C7A.

82. President Guskiewicz's announcement cited "differing perspectives within the Board of Trustees" as the reason for his departure. *Id.* His statement framed the dispute as a conflict between his "One Team" philosophy, where "we row together," and the approach of some trustees who spend "too much energy … revisiting past conflicts and internal disagreements." *Id.* Despite "this discouraging behavior by a few trustees," Guskiewicz claimed he was "appreciative of the five trustees who recently voted to strengthen their code of ethics and conduct in alignment with what our national governance advisors have said are best practices for university boards." *Id.*

83. Less than six weeks later, the Board announced that Guskiewicz would stay on as MSU's President. The announcement came as a surprise to the MSU community, as neither the

University's administration nor the Board had given any indication Guskiewicz was reconsidering his decision to leave.

84. The revised Ethics Code remains a source of institutional controversy. On October 7, 2026, *The State News* reported that five of the ten candidates currently running for MSU's Board told the outlet they would not sign the Ethics Code in its current form. Julia Roeder, *5 MSU trustee candidates say they won't sign the board's code of ethics*, THE STATE NEWS (Oct. 7, 2026) https://perma.cc/6EN3-UHG4.

***Balow Refuses to Sign the Statement of Acknowledgment***

85. Balow has refused to sign the Statement of Acknowledgment because he objects to the Ethics Code's limitations on trustee speech on matters of public importance.

86. The Trustee-Speech Restrictions forbid precisely the types of political speech that Balow has a First Amendment right to engage in as an elected trustee: public dissent from Board decisions with which he disagrees, and criticism of the university's leaders when he believes such criticism is warranted.

87. For example, the Board could sanction Balow for publicly criticizing a Board decision increasing the MSU President's salary. It could also sanction Balow for dissenting publicly from a decision to sell revenues from MSU's athletics program to private equity firms. So too could Balow face sanctions for criticizing the Office of General Counsel's response to institutional sexual abuse allegations.

88. The Board could even sanction Balow for criticizing the Trustee-Speech Restrictions, per its demand that "when the Board speaks through majority action, we will not undermine and will support the majority decision of the Board[.]" Ex. D ¶ 10.

***Defendants Withhold Balow's Trustee Resources***

89. The first deadline for Balow to sign the Statement of Acknowledgment was May 24, 2026.

90. Balow did not sign by May 24, and Defendants Scott and Fletcher began withholding resources as the Ethics Code requires.

91. Specifically, Defendants Scott and Fletcher began by revoking Balow's credentials to the Mackinac Policy Conference, a three-day gathering that convenes Michigan policymakers, national political figures, business executives, and philanthropists on Mackinac Island in late May. Speakers at the 2026 conference included Governor Gretchen Whitmer and MSU Men's Basketball Coach Tom Izzo.

92. Prior to the Board's adoption of the Ethics Code revisions, Defendant Fletcher provided Balow with credentials to attend the 2025 Mackinac Policy Conference, which Balow attended in his capacity as an MSU trustee.

93. Defendants Scott and Fletcher planned for Balow to attend the conference again in 2026 in his capacity as an MSU trustee and obtained credentials for him to do so. Balow's refusal to sign the Statement of Acknowledgment served as the sole reason Defendants Scott and Fletcher revoked his conference credentials.

94. Defendants' revocation of Balow's conference credentials materially and negatively impacted his ability to fulfill his role as a statewide elected official. By preventing Balow's attendance, Defendants Scott and Fletcher deprived him of access to information that could inform his decision-making on MSU's Board.

95. On June 12, 2026, the MSU Board issued a formal, public censure of Balow for refusing to sign the Statement of Acknowledgment.

96. Following the censure, Defendants Scott and Fletcher continued attempting to coerce Balow by threatening to revoke other resources and opportunities normally afforded to trustees. When Balow continued to refuse to sign the Statement of Acknowledgment, Defendants Scott and Fletcher revoked additional resources.

97. Specifically, on July 25, Defendant Fletcher told Balow his 2026 home-football suite allocation would be fulfilled only if the Board office received Balow's signed Statement of Acknowledgment by noon on August 2.

98. After Balow refused to sign, Defendant Fletcher explained on July 29 that unallocated tickets would be redistributed among eligible trustees "to ensure that they are used to best fulfill the ambassadorial and engagement purposes under which those tickets are granted to board members."

99. Defendant Fletcher subsequently informed Balow that he would not receive tickets, suite access, or even a parking pass to *any* sporting events until he signed the Statement of Acknowledgment.

100. Balow's refusal to sign the Statement of Acknowledgment served as the sole reason Defendants Scott and Fletcher have withheld Balow's official resources related to sporting events.

101. Prior to the Board's adoption of the Trustee-Speech Restrictions, Balow attended MSU sporting events in his capacity as an MSU trustee.

102. Balow attended the games to connect with the MSU community, including university administrators, alumni, donors, faculty, and students.

103. Engaging with these constituencies is a core part of a trustee's Board service, as it allows trustees to hear from MSU stakeholders regarding their experiences and concerns.

104. Balow relies on such engagement as a critical source of information that informs his views on issues of university governance and his decision-making on the Board. Indeed, as noted, Defendant Fletcher admitted that granting trustees sporting event tickets is necessary to "fulfill the ambassadorial and engagement purposes" of the trustee role.

105. Defendants' revocation of Balow's MSU sports tickets and suite access materially and negatively impacts Balow's ability to serve on the Board. Some of the withheld sports-related resources—such as the suite access usually afforded to trustees—are inaccessible unless Defendants provide them.

106. On September 21, 2026, Defendant Fletcher indicated that MSU would not support Balow attending events hosted by the Association of Governing Boards, a leading source of professional development for university trustees like Balow, including an event entitled "The Governance Challenge in College Athletics: Mission, Finance, and Board Oversight."

107. The Association of Governing Boards sent trustees the following description for that event, which will take place on November 10–11, 2026, in Washington, D.C.: "Trustees will join presidents, athletic directors, CFOs, and other leaders to tackle questions institutions are confronting now, from sustainable investment and revenue sharing to legal exposure and shifting decision-making authority. If athletics is on your institution's budget, risk register, or board agenda, you need to be in the room."

108. Furthermore, Balow planned to attend the Association of Governing Boards' National Conference on Trusteeship in March 2027. On September 29, 2026, Defendant Fletcher informed Balow that MSU would not support his attendance this year.

109. By refusing to support Balow's attendance at Association of Governing Boards programs, Defendant Fletcher is withholding access to experts and information that are highly

relevant to Balow's responsibilities as a trustee, including programming on policy issues presently before the MSU Board.

110. Balow's refusal to sign the Statement of Acknowledgment is the sole reason Defendants are refusing to support his attendance at Association of Governing Boards events.

111. Defendants Scott and Fletcher have also excluded Balow from several ceremonial events to which they invited trustees who signed the Statement of Acknowledgment.

112. For example, Defendants Scott and Fletcher invited the trustees who signed the Statement, but not Balow, to attend the "State of the University & Investiture for Endowed Faculty" event on September 29. Modeled in part on the State of the Union, the event features an address by MSU's President, with attending trustees seated in a prominent location. Defendants likewise excluded Balow from a ceremonial groundbreaking event for the School of Packaging building and a recognition dinner for MSU employees who responded to a power outage.

113. Although the other trustees have been invited to attend ceremonial events in their official capacities, Balow has not received calendar invites to attend any events—other than Board meetings requiring a quorum—since the Board revised its Ethics Code.

114. Balow's failure to sign the Statement of Acknowledgment is the sole reason Defendants have excluded him from ceremonial events.

115. By excluding Balow from events that trustees normally attend, Defendants Scott and Fletcher have impeded Balow's ability to fully and effectively carry out his representative role as a statewide elected officer of MSU.

116. The exclusions prevent Balow from attending any activities other than Board meetings that require a quorum. In doing so, Defendants Fletcher and Scott have effectively cut

Balow off from the places where trustees interact with students, faculty, staff, alumni, donors, and other university leaders.

117. Defendants Scott and Fletcher intend to continue imposing sanctions against Balow unless and until he signs the Statement of Acknowledgment.

118. The Trustee-Speech Restrictions are chilling Balow's speech. Balow wishes to continue speaking publicly about the administration's performance, the Board's governance of the University, and the oversight of MSU athletics, as he did in his April 2026 op-ed and podcast appearance.

119. Balow likewise wishes to speak freely about matters of great public importance, such as campus safety, tuition, room and board, student debt loads, and the University's financial condition.

120. For example, Balow wants to press for a full investigation into who at MSU knew what, and when, about Larry Nassar's decades of abuse at the University, and to address campus safety in light of reports that an MSU resident physician sexually assaulted multiple patients in 2025 after another medical program had dismissed him over similar allegations.

121. But because Balow's criticism regarding those subjects could be deemed a violation of the Trustee-Speech Restrictions, subjecting him to investigation and to further sanctions—including additional loss of resources and referral for removal from office—Balow has withheld his criticism of the Board and MSU leadership, and has refrained outright from writing op-eds to discuss his views critical of the Board's actions. Given Defendants' demonstrated willingness to punish Balow for those exact activities under the Ethics Code, his fear of further punishment is reasonable.

122. Defendants have cut Balow off from the ceremonial gatherings, conferences, sporting events, and other occasions at which trustees ordinarily interact with students, faculty, alumni, donors, and members of the public. Each day these restrictions remain in place, Balow loses opportunities to interact with the individuals he was elected to represent—opportunities that cannot be recovered after the fact or replicated, and for which money damages cannot compensate him.

123. By restricting Balow's ability to interact with individuals in the MSU community and beyond, Defendants' enforcement of the Trustee-Speech Restrictions is irreparably harming Balow's ability to fulfill the official duties of his office.

**CLAIM I**
**Facial Challenge to Ethics Code—Viewpoint Discrimination**
**42 U.S.C. § 1983**
**(Against Defendants Scott and Fletcher in their official capacities)**

124. Balow re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

125. The First Amendment, applicable to Defendants through the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech[.]" U.S. Const. amend. I. The freedom to express critical views about government is at the "very center" of the First Amendment. *Arnett v. Myers*, 281 F.3d 552, 560 (6th Cir. 2002) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966)).

126. The Trustee-Speech Restrictions violate the First Amendment because they are viewpoint-discriminatory.

127. The Trustee-Speech Restrictions prohibit any Board member from "undermin[ing]" or failing to "support" a "majority decision of the Board." Ex. D ¶ 10. A trustee who says publicly that a Board decision was correct complies with the Trustee-Speech Restrictions, while a trustee

who says the same decision was wrong has failed to "support" and has "undermine[d]" that decision. *Id.*

128. The Trustee-Speech Restrictions further instruct trustees to "embrace the principle of loyal opposition and raise issues of concern[] in appropriate settings, in advance of Board action," and in a manner "protective of the integrity of the Board's deliberations and processes." *Id.* ¶ 11. Taken together, these requirements prohibit "speech critical of the Board" but not "speech praising the Board[.]" *See Boddy v. Grech*, 178 F.4th 264, 275 (6th Cir. 2026).

129. Similarly, speech praising the University does not violate the Trustee-Speech Restrictions' requirement that trustees "uphold the university's reputation," while criticism of the University does. Ex. D ¶ 10.

130. The Trustee-Speech Restrictions, therefore, target "particular views taken by speakers on a subject," which is viewpoint discrimination prohibited under the First Amendment. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995).

131. Because they impose viewpoint-based restrictions on protected speech, the Trustee-Speech Restrictions violate the First Amendment *per se*. *See Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 756 (6th Cir. 2025).

132. Even if the viewpoint discrimination here is not unconstitutional *per se*, the Trustee-Speech Restrictions are subject to strict scrutiny and fail it.

133. Viewpoint discrimination is an "egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. A content-based restriction on protected speech is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citations omitted).

134. The Trustee-Speech Restrictions cannot satisfy strict scrutiny because insulating MSU's leadership from the criticism of elected public officials is not a legitimate government interest, much less a compelling one, especially given that "[t]he First Amendment surely promises an elected representative … the right to speak freely on questions of government policy." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022); *see also Bond*, 385 U.S. at 135 ("[T]he State has … no interest in limiting its legislators' capacity to discuss their views of local or national policy.").

135. The Trustee-Speech Restrictions also fail strict scrutiny because the MSU Board could use less restrictive means to achieve any interest it asserts here. As one alternative, the answer to disfavored speech in the public arena is counter-speech, not censorship. *See United States v. Alvarez*, 567 U.S. 709, 727 (2012) (plurality opinion) ("The remedy for speech that is false is speech that is true.").

136. The Ethics Code's Statement of Acknowledgment that requires trustees to pledge to adhere to the Trustee-Speech Restrictions reinforces the Restrictions and accordingly imposes viewpoint-discrimination as well.

137. Because the Trustee-Speech Restrictions discriminate based on viewpoint, the Restrictions chill Balow's speech on matters of public concern and inflict irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).

138. Balow has no adequate remedy at law for the deprivation of his First Amendment rights caused by the viewpoint-discriminatory Trustee-Speech Restrictions and Statement of Acknowledgment because no award of money can restore the speech opportunities he is forgoing to avoid running afoul of them, which include writing timely op-eds and appearing on podcasts to discuss his critical views of MSU leadership, causing him irreparable harm.

139. The balance of equities and the public interest favor an injunction. Defendants have no legitimate interest in enforcing viewpoint-discriminatory restrictions on an elected official's speech, and the public has a strong interest in hearing its elected trustees' candid views on how the university is governed.

140. An actual and justiciable controversy exists between Balow and Defendants over whether Defendants may enforce the viewpoint-discriminatory Trustee-Speech Restrictions and require execution of the Statement of Acknowledgment, and a declaratory judgment under 28 U.S.C. § 2201 will resolve it.

141. Balow is therefore entitled to a declaration that the Trustee-Speech Restrictions and Statement of Acknowledgment violate the First Amendment, an injunction barring Defendants from enforcing them against him, and reasonable attorney's fees under 42 U.S.C. § 1988.

**CLAIM II**
**Facial Challenge to Ethics Code—Void for Vagueness**
**42 U.S.C. § 1983**
**(Against Defendants Scott and Fletcher in their official capacities)**

142. Balow re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

143. A policy is void for vagueness if it (1) fails to inform regulated parties "what is required of them so they may act accordingly" or (2) lacks the precision and guidance "necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

144. The Trustee-Speech Restrictions suffer from both defects: They fail to adequately inform trustees regarding what speech is actionable, and they are susceptible to arbitrary and discriminatory enforcement by Board majorities. The Trustee-Speech Restrictions' vague terms

raise "special First Amendment concerns because of [their] obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997).

145. The Trustee-Speech Restrictions' terms are impermissibly vague because trustees must make "subjective reference[s]" to infer whether certain speech would be sanctionable thereunder. *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1184 (6th Cir. 1995).

146. The Trustee-Speech Restrictions' ban on "inaccurate, misleading, or false information concerning the university" could encompass anything from knowingly false factual assertions to speech that purportedly omits context, presents one-sided framing, or employs rhetorical hyperbole. Ex. D ¶ 9.

147. Similarly, the Trustee-Speech Restrictions' command to "embrace the principle of loyal opposition" and "raise issues of concerns [sic] in appropriate settings" force trustees to guess when public discussion on contested issues might later be deemed sanctionable. *Id.* ¶ 11.

148. The Trustee-Speech Restrictions also fail "to provide a clear standard for enforcement." *McGlone v. Cheek*, 534 F. App'x 293, 298 (6th Cir. 2013).

149. The Trustee-Speech Restrictions do not precisely define what it means to "undermine" Board decisions, "uphold the university's reputation," or raise concerns in a manner sufficiently "protective of the integrity of the Board's deliberations and processes." Ex. D ¶¶ 10–11. Rather, those malleable provisions lack any "terms susceptible of objective measurement." *Cramp v. Bd. of Pub. Instruction of Orange Cnty., Fla.*, 368 U.S. 278, 286 (1961).

150. The Trustee-Speech Restrictions, therefore, invite "arbitrary, discriminatory and overzealous enforcement[,]" *Dambrot*, 55 F.3d at 1184 (quoting *Leonardson v. City of E. Lansing*, 896 F.2d 190, 195–96 (6th Cir. 1990)), by affording Board majorities unfettered discretion to

determine when a dissenting trustee's speech concerning university governance is sufficiently problematic to warrant sanctions.

151. The limitless discretion the Trustee-Speech Restrictions afford Board majorities invites selective application and thus facilitates the viewpoint discrimination alleged in Claim I, above. *See Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133 (1992) ("The First Amendment prohibits the vesting of such unbridled discretion in a government official.")

152. Because the Trustee-Speech Restrictions do not tell Balow which public statements Defendants may deem sanctionable, the Restrictions chill Balow's speech on matters of public concern and inflict irreparable harm. *See Elrod*, 427 U.S. at 373.

153. The Ethics Code's Statement of Acknowledgment that requires trustees to pledge to adhere to the Trustee-Speech Restrictions reinforces the Restrictions and accordingly requires compliance with them despite their vagueness.

154. Balow has no adequate remedy at law for the deprivation of his First Amendment rights caused by the vague Trustee-Speech Restrictions and the requirement to execute the Statement of Acknowledgment promising to adhere to them, because no award of money can restore the speech opportunities that Balow is forgoing to avoid running afoul of them, which include writing timely op-eds and appearing on podcasts to discuss his critical views of MSU leadership.

155. The balance of equities and the public interest favor an injunction. Defendants have no legitimate interest in enforcing vague standards that invite arbitrary and discriminatory enforcement, and the public has a strong interest in ensuring that its elected trustees are governed by clear rules rather than the shifting preferences of a Board majority.

156. An actual and justiciable controversy exists between Balow and Defendants over whether Defendants may enforce the vague Trustee-Speech Restrictions or require execution of the Statement of Acknowledgment, and a declaratory judgment under 28 U.S.C. § 2201 will resolve it.

157. Balow is therefore entitled to a declaration that the Trustee-Speech Restrictions and Statement of Acknowledgment violate the Due Process Clause of the Fourteenth Amendment, an injunction barring Defendants from enforcing them against him, and reasonable attorney's fees under 42 U.S.C. § 1988.

**CLAIM III**
**First and Fourteenth Amendment Challenge to Ethics Code—Unconstitutional Conditions**
**42 U.S.C. § 1983**
**(Against Defendants Scott and Fletcher in their official capacities)**

158. Balow re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

159. The Ethics Code's signature requirement imposes an unconstitutional condition on Balow.

160. As described above, the Trustee-Speech Restrictions are unconstitutionally viewpoint-discriminatory and vague. As a result, Defendants cannot force trustees to abide by them without violating their First and Fourteenth Amendment rights. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 612 (2013).

161. Yet Defendants have attempted to coerce trustees into giving up their First and Fourteenth Amendment rights by conditioning their access to official resources on their signing a Statement of Acknowledgment agreeing to abide by the Trustee-Speech Restrictions and by automatically stripping those resources if they refuse to sign.

162. The Statement of Acknowledgment requirement violates the unconstitutional conditions doctrine, which "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Id.* at 604.

163. Balow has suffered a constitutional injury because he refused to surrender his First Amendment rights by signing the Statement of Acknowledgment and, as a result, forfeited access to official resources necessary to fulfill his responsibilities as an elected trustee.

164. Defendants will continue to enforce sanctions unless and until Balow signs the Statement of Acknowledgment, forfeiting his constitutional rights. Defendants will continue to exclude Balow from events attended by the MSU community, refuse to reimburse his travel expenses, and prevent him from engaging with Michigan voters and other leaders in his capacity as an MSU trustee.

165. Defendants have therefore violated Balow's constitutional rights and will continue to do so by enforcing an unconstitutional-conditions scheme against him.

166. Balow suffers irreparable harm every day that Defendants condition the resources of his office on his surrender of the right to criticize MSU's leadership, because the loss of First Amendment freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. That injury is ongoing because Balow will continue to be excluded from accessing official resources, opportunities, and privileges until he agrees in writing to abide by the Trustee-Speech Restrictions.

167. Balow has no adequate remedy at law. No award of money can restore the conferences, ceremonies, and other gatherings of MSU stakeholders and Michigan policymakers that Defendants have barred him from attending, or the opportunities to speak with those constituencies that he has lost as a result. Nor can those opportunities be replicated.

168. The balance of equities and the public interest favor an injunction. Defendants have no legitimate interest in enforcing an unconstitutional condition, and the people of Michigan, who elected Balow to oversee MSU, have a strong interest in hearing his candid views on how the university is governed. *See G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

169. Balow is therefore entitled to an injunction enjoining Defendants from withholding or conditioning any of Plaintiff's official resources, privileges, and opportunities on his signing the Statement of Acknowledgment in the Ethics Code, a declaration that the Statement of Acknowledgment in the Ethics Code violates Balow's First and Fourteenth Amendment rights, and reasonable attorney's fees under 42 U.S.C. § 1988.

**CLAIM IV**
**First Amendment Challenge to Ethics Code— As-Applied**
**42 U.S.C. § 1983**
**(Against Defendants Scott and Fletcher in their official capacities)**

170. Balow re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

171. As described above, Defendants have withheld resources because Balow engaged in protected First Amendment activity by declining to agree in writing to abide by the Trustee-Speech Restrictions.

172. As a result of Balow's First Amendment activity, Defendants have barred Balow from events attended by the MSU community, refused to reimburse his travel and conference expenses, and prevented him from engaging with Michigan voters and other leaders in his capacity as an MSU trustee, thereby directly interfering with his ability to fulfill those responsibilities. *See Diei v. Boyd*, 116 F.4th 637, 644 (6th Cir. 2024) (explaining that an as-

applied First Amendment claim focuses on the "'objective nature of the challenged restriction.'") (quoting *Greenwich Citizens Comm., Inc. v. Cntys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 31–32 (2d Cir. 1996)).

173. Defendants would not have taken these actions but for Balow's refusal to sign the Statement of Acknowledgment.

174. Defendants have therefore violated Balow's constitutional rights.

175. Defendants will continue to enforce sanctions unless and until Balow signs the Statement of Acknowledgment.

176. Balow has suffered a constitutional injury because he refused to surrender his rights by signing the Statement of Acknowledgment and, as a result, was deprived of access to official resources, thereby directly interfering with his ability to fulfill his responsibilities as an elected trustee. That deprivation of Balow's rights for insisting on maintaining the ability to speak critically of the Board and/or MSU was imposed upon him as a result of his engaging in such critical speech and would chill speakers of ordinary firmness.

177. Defendants will continue to enforce sanctions unless and until Balow signs the Statement of Acknowledgment, forfeiting his constitutional rights. Defendants will continue to exclude Balow from events attended by the MSU community, refuse to reimburse his travel expenses, and prevent him from engaging with Michigan voters and other leaders in his capacity as an MSU trustee.

178. Defendants have therefore violated Balow's constitutional rights and will continue to do so by enforcing an unconstitutional-conditions scheme against him.

179. For the reasons alleged in Paragraph 166, Balow is suffering ongoing irreparable harm. Each day that Defendants withhold his access to official resources, opportunities, and

privileges because he refused to sign the Statement of Acknowledgment deprives him of First Amendment freedoms. *See Elrod*, 427 U.S. at 373.

180. As alleged in Paragraph 167, Balow has no adequate remedy at law for the lost opportunities to attend MSU events and engage with its stakeholders and Michigan policymakers.

181. For the reasons alleged in Paragraph 168, the balance of equities and the public interest likewise favor an injunction. Defendants have no legitimate interest in penalizing Balow for exercising his First Amendment rights. *See G & V Lounge*, 23 F.3d at 1079.

182. Balow is therefore entitled to an injunction enjoining Defendants from withholding or conditioning any of Plaintiff's official resources, privileges, and opportunities on his signing the Ethics Code's Statement of Acknowledgment or abiding by its Trustee-Speech Restrictions, a declaration that those provisions of the Ethics Code violate Balow's First Amendment rights, and reasonable attorney's fees under 42 U.S.C. § 1988.

## DEMAND FOR JURY TRIAL

183. In compliance with Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Michael Balow respectfully requests that this Court enter judgment against Defendants and issue the following forms of relief:

A. Declare that the Trustee-Speech Restrictions (Ex. D ¶¶ 10–11) are facially unconstitutional because they discriminate based on viewpoint, in violation of the First Amendment;

B. Declare that the Trustee-Speech Restrictions (Ex. D ¶¶ 9–11) are facially void for vagueness, in violation of the Due Process Clause of the Fourteenth Amendment;

C. Declare that the Ethics Code's Statement of Acknowledgment requirement violates Balow's First Amendment rights;

D. Declare that the Ethics Code's Statement of Acknowledgment requirement violates Balow's Fourteenth Amendment rights;

E. Issue a preliminary injunction enjoining Defendants from withholding or conditioning any of Plaintiff's official resources, privileges, and opportunities on his signing the Statement of Acknowledgment, pending final judgment;

F. Issue a permanent injunction enjoining Defendants from withholding or conditioning any of Plaintiff's official resources, privileges, and opportunities on his signing the Statement of Acknowledgment;

G. Issue a preliminary injunction enjoining Defendants from enforcing the Trustee-Speech Restrictions (Ex. D ¶¶ 9–11) against Plaintiff pending final judgment;

H. Issue a permanent injunction enjoining Defendants from enforcing the Trustee-Speech Restrictions (Ex. D ¶¶ 9–11) against Plaintiff;

I. Award Plaintiff his attorney's fees under 42 U.S.C. § 1988 and any other applicable law;

J. Award Plaintiff his costs; and

K. Award such other relief as the Court deems appropriate.

DATED: October 28, 2026

Respectfully submitted,

*<u>/s/ Greg H. Greubel</u>*
Greg Harold Greubel
IA Bar No. 201452; PA Bar No. 321130;
NJ Bar No. 171622015; CA Bar No. 343028

HEATHER PINCUS
New York Bar No. 6324255
FOUNDATION FOR INDIVIDUAL RIGHTS
AND EXPRESSION (FIRE)
510 Walnut Street; Suite 900
Philadelphia, PA 19106
Tel: (215) 717-3473
greg.greubel@fire.org
heather.pincus@fire.org

ROB EDWARDS
D.C. Bar No. 90027477
FOUNDATION FOR INDIVIDUAL RIGHTS
AND EXPRESSION (FIRE)
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
rob.edwards@fire.org

BRANDON M. GRYSKO
Michigan Bar No. P82751
FAUSONE & GRYSKO, PLC
41700 West Six Mile Road, Suite 101
Northville, MI 48168
Tel: (248) 912-3240
bgrysko@thefgfirm.law

*Counsel for Plaintiff Michael Balow*

## VERIFICATION OF MICHAEL BALOW

Under 28 U.S.C. § 1746, I, Michael Balow, declare as follows:

1. I am the Plaintiff in the present case.

2. I have read the foregoing Verified Complaint.

3. I have personal knowledge of the factual allegations in paragraphs 26–33, 36, 41–46, 78, 80, 83, 85, 90–106, and 108–123 of the Complaint and know them to be true.

4. I verify under penalty of perjury that the foregoing is true and correct.

Executed on October 27, 2026.

Michael Balow