# Exhibit B

MINUTES OF THE MEETING
OF THE
MICHIGAN STATE UNIVERSITY
BOARD OF TRUSTEES

May 17th, 2026

Trustee Brianna Scott called the meeting of the Board of Trustees to order at 8:00 p.m. via livestream.

Trustees present: Rebecca Bahar-Cook, Mike Balow, Dennis Denno, Renee Knake Jefferson, Sandy Pierce, Brianna Scott, Kelly Tebay, and Rema Vassar.

University officers present: Provost and Executive Vice President McIntyre; Senior Vice Presidents Frace and Hubbard; Vice President and General Counsel Quinn; Secretary Fletcher; Vice Presidents Batt, Beekman, DeVooght, Guerrant, Hintz, Priya, Rugless, Swain, and Tobin; Associate Vice Presidents McFarlane and Tarrant. Faculty liaisons present: John Aerni-Flessner, Jack Lipton, and John McElroy. Student liaisons present: Maddie Hanes and Priyanka Kothari.

All actions taken were by unanimous vote of the Trustees present, unless otherwise noted.

1. On a motion by Trustee Pierce, supported by Trustee Bahar-Cook, the **BOARD VOTED to approve** the proposed agenda.

Trustee Balow provided the following comments.

Trustee Balow here. If you can hear me, my question is, are we in compliance with our meeting codes and Open Meetings Act, because of the timeliness of this posting which was inside of the eighteen hours, I think, required. Can we get a comment from you, the chair, on that?

Trustee Scott provided the following comment.

I would defer to legal counsel and the Board Secretary, who did the posting, if they could go over that, if that's appropriate.

Secretary Fletcher provided the following comment.

Yes, we are in compliance with all applicable requirements to the Board of Trustees as a constitutional corporation under the State of Michigan. Brian, do you have any further comment?

General Counsel Quinn provided the following comment.

No, that is correct.

Trustee Balow provided the following comment.

Just for the education of our audience, is that twelve hours, is it five hours? What's the requirement?

Secretary Fletcher provided the following comments.

So, under the Michigan Constitution, the Board of Trustees has a wide latitude when it comes to sort of, the posting practice, so the Open Meetings Act really is used as guidance versus anything specific. Adequate notice was provided by all reasonable means under the Board's Bylaws, Article Two. Brian, any further comment?

General Counsel Quinn provided the following comment.

No, that is correct.

Trustee Balow provided the following comments.

Is it any problem that I just checked the website, the forward-facing public website, and I don't see any documentation as to either of the resolutions that we're going to be considering and voting on?

Secretary Fletcher provided the following comment.

I see the resolutions as posted on my end. No, it is not a problem. Thank you for asking the question, Trustee Balow.

Trustee Balow made the following comments.

Okay, because I checked about five minutes ago and didn't see the links. And lastly, I think you've answered those questions. The last one I have is, does anyone have a problem with the fact that the resolution on the Code of Ethics did not make its way through our typical university committee governance? It was dropped on Wednesday night and didn't pass through the normal procedure for such policy revisions. That's addressed to the Chair.

Trustee Scott provided the following comment.

Other than you, I don't see any other hands of anyone assenting to having a problem with it, nor do think this is atypical under the circumstances.

Trustee Vassar provided the following comments.

I actually raised my hand. I apologize, I know you probably can't see me, but I did raise my hand. I do have an issue that we have governance policies and practices in place which would allow for policies to go through committees to be vetted through a process whereby we all agreed was the best process, and this policy has not gone through that vetting, and the committee has not had an opportunity to, one, look at and edit the policy, but then two, to bring it to the larger body for further scrutiny and pruning. So, I do take issue with this process and how the policy is an agenda item this evening.

Trustee Balow made the following comments.

I'll just conclude by saying, in summary, I object to the rapid nature scheduling of tonight's meeting, and don't feel it's in the best interest of the subject matter at hand, given the procedures that we normally follow and the transparency we like to have for the University. Thank you.

Roll Call Vote

Trustee Bahar-Cook—Yes
Trustee Balow—No
Trustee Denno—Yes
Trustee Knake-Jefferson--Yes
Trustee Pierce—Yes
Trustee Scott—Yes
Trustee Tebay—Yes
Trustee Vassar—No

**THE BOARD VOTED to approve** the proposed agenda.

2. Code of Ethics and Conduct

Trustee Scott presented the revisions to the Board of Trustees Code of Ethics and Conduct.

We're called to today's special meeting to take up improvements to the Code of Ethics and Conduct. The Board has not made revisions to this code since 2020, and throughout the last few years trustees have engaged in professional development, training, discussions around governance principles, including work with an external consultant that specializes in board governance practices that are in the best interest of university boards. These updates are strengthening governance standards and reinforcing existing responsibilities and obligations entrusted to members of the MSU Board of Trustees. Public universities function best when there is trust, respect for the process, and a shared commitment to the factual and informed decision making. For some who may be asking, why now? During a special board meeting on a Sunday night, I say that it is never the wrong time to do the right thing. Further, at our most recent April work session, we were

given feedback on our governance, which was quite frankly amounting to a failing grade. Yet, since that time, a few members of this board have continued to act against our own governance guidance and consultation given to us by national experts, undermining the president, the administration, and decisions made by this board, attacking members of the administration and trying to interfere in personnel matters and spreading misinformation to constituent groups outside of and within the University, and that has got to stop. So why now? Because we can't continue to operate this way. Even today, The Detroit News was given an inaccurate version of the resolution we are voting on tonight, that was leaked in advance on purpose and creating a very false narrative on what we are doing with our Code of Ethics and Conduct. That behavior is a perfect example of why a stronger code and accountability are necessary. This isn't approach suppressing speech. Again, I will say this isn't approach suppressing speech, or preventing any trustee from speaking their mind, asking hard questions, or holding the administration accountable. But we know that our president is frustrated, and as we will talk about in a separate agenda item later tonight, we want to foster an environment where he can be successful in his leadership and his vision for Michigan State University. With that, I am going to move for the following.

As chair of the Audit, Risk and Compliance Committee, I move that the Board of Trustees hereby approves revisions to the Board of Trustees Code of Ethics and Conduct in Attachment A. (Appendix A)

Be it further resolved that under the provisions of the revised policy, trustees are required to sign the revised Code of Ethics and Conduct without altering or changing it or adding to it later than May 24, 2026, at 5:00pm. Again, trustees are required to sign the revised Code of Ethics and Conduct no later than May 24, 2026, at 5:00pm. I will now call for support.

Trustee Scott **moved to approve** the recommendation, with support from Trustee Pierce.

Trustee Balow provided the following comments.

So, it's very disappointing to me that this abomination of a university policy is being put on the agenda on a Sunday night at eight o'clock and not have gone through the channels as Trustee Vassar mentioned, which we know is the Academic Affairs Committee, the ARC Committee like every other policy we do. For instance, the one that we worked on just a few weeks ago, which had four simple changes, and which you, you had go through that process, which took three or four months. I think that this is something that is absolutely an assault on the First Amendment rights of any person who's serving in any sort of elected capacity, and an assault on the governance capability of those of us who might be in the minority at any given time, and to the point, this resolution, as drafted, not some previous draft that you refer to, keeps certain trustees out of committee meetings, allows, or forbids us for speaking out if it's considered negative, or if it's considered offensive

to perhaps the majority on the board, it offers immediate sanction, as you just pointed out with your timeline. One of the worst things is if there's a trustee who's referred to the ARC committee, there's an anonymous three-person panel, which is not very American in my opinion, who we would never know who is considering the actions at hand that would then refer us for further action. There's a stripping of legal representation if we're in legal jeopardy in some sort of investigation, and unlike taking five votes to be able to change something, this puts a requirement that six votes out of eight would be required to change in the future, and if someone was under investigation but not found guilty of anything, they would be precluded from voting, so that they would be disenfranchised, particularly if they were innocent. I'd like to point out also that this document is intended to keep information from trustees by keeping us from addressing and asking senior executives, and you might claim otherwise, but the way this is drafted certainly leaves wide latitude to the majority of the Board to silence the minority at any given time. I'm very upset with the general counsel and you for drafting it this way, and for not considering changes, and for dropping it on us on Wednesday night, and we've had a hell of a time dealing with this over the last few days, with everything going on in our personal lives, when you had every opportunity to handle this in the normal course of business at the June Board Meeting, which is coming up in less than a month. And I, in particular, find it particularly rich that you, of all people, are driving the bus on this, who probably had the biggest violation of what it would have been in October of 2023 when you released a tell-all letter to the public, which drove this board into chaos. I object to the content of this resolution. I object to the methods that we're using in the dark of night, when most people are watching the Pistons right now, and I think that it's very unfortunate that a university board that considers itself to be for transparency and for the people uses petty differences like getting upset that trustees wrote an op-ed, which I've heard repeatedly over the last few days, to say that we need a policy like this. Our policy and our power comes from the state constitution, that is the highest and supreme power, and if you pass a resolution like this, I will not sign, and if it's ever enforced, I don't think it can be enforced. And furthermore, I asked for a legal opinion to see if it was in compliance with First Amendment rights in the state constitution, and it hasn't been provided, and I think it's poor form, poor policy, and I think the University is a lesser place once this is passed. Thank you.

Trustee Vassar provided the following comments.

This is reminiscent of a night in March where such a meeting was conducted surreptitiously to me with the cloak of night. I would also just say that I've been handling all of this while in Egypt. It is 3:14 a.m. and this board knew that there was a seven-hour gap and still chose to have this meeting on a Sunday at 8 p.m., Eastern Standard Time. I've been a member of this board since January 1, 2021. I was elected by 2.4 million Michigan voters to provide independent oversight of this university. I was the first Black woman ever to serve as chair of this board, elected chair of this board, in its 168-year history. I say that not for ceremony, I say it because what has been done to me on this board and what is being voted on

today cannot be understood without that context. I will be comprehensive because the record requires it. On the authors of this document, this policy was co-authored by Board Chair Brianna Scott and General Counsel Brian Quinn. I am stating that on record, because it is a fact that this board should not ignore. Brian Quinn is the subject of a formal written governance complaint filed by members of this board. That complaint documents years of overreach, interference, withheld documents, conflicts of interest, and conduct that multiple trustees have characterized as seriously injurious to this university. The complaint is 78 pages. It has been provided to the press. It is signed. It is in the possession of this board and this administration. The general counsel, whose conduct is under formal scrutiny, helped write the ethics code that we use, will be used, to investigate, sanction, and silence the trustees who scrutinized him. That is not governance, that is collusion. And every member of this board voting yes today is voting in full knowledge of that fact. I also want to name what it means that the Board Chair co-authored this document with him. Trustee Scott chairs the body that is supposed to provide oversight of this university. She sits on the board of Spartan Ventures, the same private entity that this board refused to subject to FOIA requirements on a five to three vote. She co-authored with the University's own lawyer, a code of conduct that restricts the speech of the two trustees who voted, or the three trustees who voted against her on that question. That is not a coincidence, that is a closed loop of self-protection, and it's, it's on toward and duplicitous. On what this document means, I want this record to be precise. This policy prohibits trustees from making critical public statements about Board decisions, University administrators, faculty, staff, or students after Board action has been taken. It requires every trustee to sign it unaltered, unaltered, I believe, was the word, unedited within seven days of any amendment under penalty of immediate automatic sanctions. Those sanctions include public censure, revocation of all event access, removal from speaking programs, suspension of travel, removal from leadership positions. They take effect at the moment of noncompliance. There is no hearing. There is no justice. There is no due process. For elected constitutional officers, for people chosen by the voters of Michigan, automatic punishment without due process is not an ethics standard. It is a trap. The policy also strips University indemnification from any trustee under investigation, while simultaneously requiring that that trustee surrender their personal phones and devices. You are required to give up your personal property. You are not entitled to representation. And the instrument demanding both was written by the lawyer who has a personal stake in silencing the people most likely to be investigated under it. I want the Attorney General of the State of Michigan, Dana Nessel, to hear this, and I will be following up with her office regarding the constitutionality of this document. Michigan's popularly voted, elected constitutional officers do not surrender their First Amendment rights as a condition of service. A prior restraint on the political speech of elected trustees on matters of direct public concern is constitutionally suspect on its face, and it demands independent review. I'm formally putting this board and this administration on notice that I intend to pursue that review. On the amendment provision, what I am calling governance gerrymandering. This government, this document, requires six of eight trustees to amend it, as Trustee Balow said, with

five trustees aligned with the majority faction that drafted it, that threshold is effectively unreachable by the current minority, but it goes further, as Trustee Balow illustrated. If you're under investigation as a trustee when the sanction, or sanction when an amendment is opposed, this code makes it easy to engineer exactly that, by the way, that trustee is recused. If all three minority trustees are simultaneously sanctioned or investigated, the remaining five trustees must produce six affirmative votes to amend the code. Five people cannot produce six votes. I majored in English, but I can do the math. The code becomes mathematically permanently frozen. I want this board and the public to understand what that is. It is the same principle being applied right now in state legislatures across the South, in Georgia, in Texas, in Florida, in Alabama. Legislators who cannot win the argument are redrawing the lines, they are engineering thresholds, they are installing mechanisms that make it impossible for the opposition to prevail, not by persuasion, not by merit, but by construction. They call it governance, we call it what it is, gerrymandering. What is happening in this room today is the same. The majority cannot win the argument on the merits. The Governor of Michigan, told them so. And so, they are changing the rules, they are drawing the lines, they are locking the minority out by outvoting us, but by, not by outvoting us, but by designing a system in which our votes eventually cannot count. That is not governance, that is entrenchment, that is insulation, and it belongs in the same moral category as every voter suppression effort being litigated in federal courts across this country right now. What has been done to me on this board? I was investigated by Miller and Chevalier from October 2023, through February 2024. The investigation cost this university more than $2 million. It investigated me, one Black woman trustee, $2 million. While it was ongoing, comparable conduct by other trustees went uninvestigated, unchallenged, and unremarked upon. The investigation found that I unintentionally violated provisions of the Code of Ethics. I argue with that, but that's what the investigation found. Violations the firm acknowledged were not for personal gain, did not reflect any actual conflict of interest, and caused no demonstrated harm to this university. The firm acknowledged that. The recommended sanction was referral to the governor for removal from elected office. This very policy says the same, and when I brought this up, that no malfeasance, no crime. The response from the chair was, "We still refer you." So, it's basically for public humiliation. For comparison, the same investigation found that Trustee Scott intentionally violated the code of ethics by publicly disclosing privileged attorney-client communications. The recommended sanction was, and I'm quoting directly, "no more than censure." Intentional misconduct got the lowest available sanction. Unintentional conduct by me, the most extreme available. An attempt to have an elected official removed from office by the governor. The pattern is not subtle, it is documented, it is on the record. On March 4, 2024, this board censured me, referred me to Governor Whitmer for removal, stripped my committee assignments, and excluded me from ceremonial trustee functions, even though there was no malfeasance, no misconduct, and no harm to the University. On June 2, 2025, Governor Whitmer declined to remove me. This is the most authoritative verdict available on what this board did. The statutory predicate invoked to send me to the governor's office was not, after

independent review, satisfied. The governor looked at this board's case and said no. The vindication is on the record, the vote is on the record, and everyone in this room who votes yes today does so, knowing both. I was also confronted without notice, without counsel, without the basic courtesy of knowing what the evening was for, at a private dinner at the President's residence, where I was informed, I was the third agenda item. The board secretary has confirmed a conversation occurred. I have been consistent in my account of the moment from the time that it happened. That was not a collegial exchange, that was a setup. It was an ambush. It was designed to intimidate me, who was asking questions that powerful people in the room did not want asked. And now the instrument, designed to ensure that I can never publicly describe it again after tonight, is being voted on today. On what this culture produces, I want this board to sit with one number, $500 million. That is what this university paid, because a culture of institutional silence allowed a predator to operate in plain sight for decades. That culture did not require villains, it required people who went along, trustees who deferred, who asked no questions, administrators who protected their own, a general counsel whose office ran interference on investigations instead of supporting them, a board that treated loyalty to leadership as the highest virtue and accountability as an inconvenience. The culture that produced Larry Nassar was built brick by brick through exactly the mechanisms being ratified in this document. Silence the questioners, protect the administrators, punish the people who speak, make the rules such that dissent is treated as a violation. You are building that culture again today with this vote, and you are building it with the full knowledge of what the last version has cost us and continues to cost us. I will not sign this document, that is my position. I am a popularly elected constitutional officer of the State of Michigan. The Michigan Constitution grants this board its authority. It does not authorize this board to strip my First Amendment rights, compel my signature under threat of punishment or design an amendment process engineered to silence me permanently. I will follow up, as I said, with Attorney General Nessel, regarding the constitutional questions raised by this document. I will continue to speak. I will quote Zora Neale Hurston, "If you do not speak, if you are silent, they will kill you and say you enjoyed it." I will speak publicly, precisely, and on the record, about the conduct of this board and this administration. I will continue to represent the 2.4 million voters who elected me to do exactly that. And I want to say this directly to my colleagues who will vote yes today, you are not protecting this university, you are protecting yourselves, you are protecting the general counsel, who has been formally questioned by multiple members of this board. You are protecting a board chair who co-authored this document with that same lawyer. You are protecting a president who engaged outside counsel to advise on how to manage the trustees asking hard questions. The distance between protecting this university and protecting the people who run it is the distance that cost this institution $500 million and its reputation. I will not pretend that distance does not exist, because it's inconvenient to name it. The people of Michigan elected me to name it, and I'm naming it now.

Trustee Balow provided the following comments.

Yeah, so that made me think of something else. I'd like everyone to know that I'm obviously a new trustee, you know. I came on board last year, been here one year and several months, and from day one I tried to, you know, bring this board together against some of this nonsense from the past. Miller Chevalier, $2 million here, $2 million there, and there are members of you on this board who have told me that you know that parts of that report are inaccurate, and yet you still voted to censure two trustees, Denno and Vassar, and send them to the governor, and I can't say how disappointed I am that I haven't been able to get you to walk that back and to try to bring some unity to this board. But it's clear to me now that some of you enjoy the division and this latest chapter and this abomination of a policy can and will be used or will be attempted to use, used to silence trustees, but it won't be tolerated. We were elected to do a job, we will do that job, and that's how it's going to be.

Trustee Bahar-Cook provided the following comments

Thank you. I want to just talk about silencing trustees. I, for one, do not think that this policy does not allow us to ask hard questions or challenge assumptions or stifle debate, right. There is a time and place for that to occur. We do it in committee, we do it at the board work session, and we're doing it right now in a board meeting. Those are the appropriate places for which to have these conversations, and so you know, it's no secret, I think, to the members of the board that there's a particular policy that I've been advocating for, and it's slow to be developed. I haven't gone and criticized the administration; instead, I'm working with the administration to try and get them to hear what it is I'm trying to say, and we've had meetings, and we've had discussions, and we've talked about it, and I pushed, and I've pushed it, and I don't ever feel like this, this new policy would not allow me to do that. It absolutely would. I mean, strong governance ensures that all trustees have a voice, but we need to be professional, we need to be accurate, and we need to do it in the form in which we are elected to do it, which is as part of the board. I mean, there's nothing wrong with having different perspectives, but we are a board that runs as a democracy and majority rules, so you know minority opinions, absolutely share your thoughts, share your worries, share your concerns. We want to hear it, but relitigating over and over and over and over and over again after an issue has been voted on doesn't help us move forward, it gets us stuck, and that's, for one, why I think it's, so this policy is so important, right? So, it says, look, here's what's acceptable behavior, if there's not, if you're not willing to follow this document, the board governing itself, then there are consequences, and I would think that you would want to know what those consequences are for clarity purposes. So, we have, you know, fiduciary and ethical responsibilities to this university. I, for one, do not think that this code of conduct stifles that. In fact, you know, I'm very eager to sign it and move forward, so you know whether that comes from Stefan or Brian, you know, send something in tonight, I'll sign it and forward it back to you. I'm not afraid of what this policy does. I think it strengthens the board.

Trustee Balow provided the following comment.

Good points as always Rebecca Bahar.

Trustee Scott provided following comment.

Hold on, hold on a second.

Trustee Balow provided the following comment.

I want to address a good… oh, you want to say something?

Trustee Scott provided the following comment.

If you could just let me, because I'm trying to get people in the order that the hands are raised, but I don't know who… like you just started talking, so just finish, Mike. Go ahead, please.

Trustee Balow provided the following comments.

I apologize. Just briefly, because I appreciate your points, Rebecca Bahar-Cook. As always, thoughtful. Just a couple things. You know, respectfully, I don't think any trustee can determine when it's appropriate for another trustee to comment. If the tables were turned, I would never ever tell any of the seven of you that you can't talk or can't write an op-ed or can't express your opinion, because again, for instance, we beat this to death in the few hours that we were together this week on Zoom calls, but a large part of this obviously derives from the fact that Trustee Denno and I co-authored an op-ed where we express opinions, did a podcast, which I thought was very respectful, got calls from governance bodies complimenting us on the thoughtful op-ed. I know Trustee Vassar has produced thoughtful op-eds, and that is to the betterment of the University. There's a reason the Supreme Court publishes a dissenting opinion. It's an American thing; it's a good thing. Dissent doesn't mean disrespect. So, I just want to put that out there, and I think that we're better off when we have more discussion about the issues that affect MSU, and we never ever try to tamp them down for any reason whatsoever.

Trustee Scott provided the following comment.

Okay, I was just reminded that we have to follow certain rules with discussion, so you get two comments under Robert's Rules. Trustee Vassar, on one topic.

Trustee Vassar provided the following comments.

So, Trustee Bahar-Cook, thank you so much for your thoughtfulness and your comments. The first thing you said was that we go through committee, which again, I wish this policy had gone through committee, because I think it's if it's that important that you, that we had to have a meeting at 8:00 p.m. on a Sunday night, then it should have been important enough to take the time to vet through our policy and our practice that we've already agreed upon, so I, that was the first thing you said, was, you know, we have committee, we do, and we should have used that for this. You also talked about acceptable behavior, professionalism, all of that is subjective, and I said that. I said as much, right? As a Black woman on this board, I have had my conduct viewed in ways that other people haven't. I was criticized for showing up after we had a shooting on campus, right? For interfering, I was the only one named, by the way. There were three other trustees who came with me to help to lend a hand once we had a crisis, but I was the one named as interfering. What is deemed as professional and acceptable has implications that are rooted in some of the things that you know I'm talking about, even having that agenda item with me. Okay, sure. You want to talk about me in front of a mixed company, and actually chastised me for writing an op-ed, which we can talk later about the semantics of the op-ed. They're not inaccurate, it's a difference of looking at the same picture, I suppose, or spin, but either way, that chastisement didn't come for, as Mike and Dennis just said, or as Mike said about him and Dennis, he and Dennis, and their, their op-ed, that chastisement didn't come for them. We didn't have a whole meeting for them; we didn't have a whole meeting to talk about their behavior. I think that's what is most appalling to me. This policy is punitive. It looks and reads like someone has to be policed. There is no policing in a collegial, collaborative board where you have a culture of compromise and respect, you don't need to police one another, and instead, particularly two trustees who are big on policing, which would be Brianna Scott and Renee Knake Jefferson, all the time we decide to instead force people into compliance and try to control them instead of being in community with them and in communication with them and collaborative relationships with them. Control and coercion are always community killers, and so I would just urge you people to think about all the AGB said from the time that they've come to talk with us. I think that was four years ago. They've consistently said you need to repair relationships, you need to repair damage, and every time the response is: we will police your behavior, we will make sure that you are acceptable under what we deem is professional, and there's a whole body of literature about what that means for Black women, particularly who dissent.

Trustee Pierce provided the following comments.

Thank you. What I would want to say is that the only ones, and it's my understanding, anyway, that can govern this board of trustees is the board of trustees. So, we govern ourselves, and I don't see anywhere in here where we are forbidden or we're prevented from free speech, and I think it's healthy to have debates, and we've had lots of them behind closed doors, in the public meetings. I want to continue having those. I think it, I think that's good governance, but we have some of the trustees have violated the governance principles that President

Guskiewicz set forth when he joined. The Code of Conduct, I mean, confidential information being leaked, inaccurate, inaccuracies in some of the published out there, it's just it's not right. We shouldn't be doing it. We should really handle it inside. So, to me, this is about really governing ourselves, and the reason I don't have a problem signing it is that I've never done any of the things that some of the trustees have done externally, and I don't plan to. It's not, it's my fiduciary responsibility to govern the University, and we need to hold each other accountable, and that's what I'm asking for, and I am just really disappointed that some of the trustees feel like this is not what we're trying to do, but I don't feel at all that it forbids us to speak out. I don't see that.

Trustee Tebay provided the following comments.

Thank you. I feel the proposed revisions of the code clarify expectations around conduct, confidentiality, fiduciary responsibility, and respectful engagement. Some will compare behavior and code to other public, publicly elected officials, but even the state legislature can self-govern members of the chamber that are disruptive to the body as a whole and does so when needed. Through our engagement with an external consultant, it is evident that there are improvements we need to make to both our guidelines and our code of ethics and conduct, but also board accountability to those guidelines. We welcome debate and discussion inside our boardroom. Trustees are allowed to vote however they wish, and to comment on reasons for that. Once a decision is made by the majority of the Board, that's the settled direction of the university, even if we don't personally agree. The state constitution vests authority in the board as a collective, not as individuals. Continually trying to undermine or sabotage Board decisions passed by a majority of the board is undermining the collective majority representing the citizens of the state of Michigan that vested authority in a collective board. I have no issue, as others have said, I have no issue signing this code of conduct or the code of ethics immediately, as I've committed to our governance principles since we created them and will continue to do so.

Trustee Scott provided the following comment.

Thank you, Trustee Tebay. I believe Trustee Knake-Jefferson probably cannot speak, but I'm going to call her in case she can to see if she has a comment. Okay.

Trustee Pierce provided the following comments.

The other thing I really want everyone to know is that what's going outside of the governance principles and the code of conduct that we currently have has done at the University is has caused a lot of frustration among the entire administration. They have day jobs, they're doing big work for this university, and I will tell you, I'm not just talking about President Guskiewicz, because he's very frustrated, but I'm talking about all of the administration who just, want to do their job and don't want to worry about what's going to be said about them or they're going to be taken to

task or something's going to be filed against them, and again, when AGB presented the survey results of the trustees, the survey results of the administration, I was mortified, because as a board we flunked, as a board we flunked, and I think that's a result of going outside of government principles with, it's just so, we have a frustrated administration, and you're going to hear me in a few minutes when we get to the next agenda item, talk about Kevin Guskiewicz and how frustrated he is, and he is being aggressively pursued. There's lots of openings in this country, he's being aggressively pursued, and we don't want to lose him, and I don't want to lose the administration.

Trustee Scott provided the following comments.

Thank you, Trustee Pierce. I just wanted to just add again, or stress again, that these updates, and again, they're updates. All we did is updated our code of ethics and code of conduct, and it is my understanding, Trustee Balow, that you never even signed the first set of Code of Ethics and Conduct, so I'm not surprised that you wouldn't sign this one, but be that as it may, it does not prevent free speech. I think all of us appreciate diversity of thought. We have very engaging conversations. I have been persuaded by every single person on this board from my positions plenty of times, and vice versa. I think that that is important. I don't believe that is going to be stopped by anything that we're doing related to the code of conduct amendment, and I think it's only going to make us better, as Trustee Pierce said. But one thing I have to take exception with, and then I'll end, is that it is not right for those that don't agree with what we're doing to in any way try to bully or threaten other members of this board about wanting to take up this this item on our agenda today. I think it's wrong. I think that kind of conduct, and to try to silence board members from doing what we think is appropriate in today's board meeting, being a special meeting, is a symptom of what we're trying to fix, and I'm hopeful that those of you that are saying you won't sign, that you will think about it, because I absolutely don't see that this is going to stop you from doing the work of providing very good discourse during our meetings, so with that, I am going to ask Stefan Fletcher to do a roll call vote.

Trustee Balow provided the following comments.

Well, hold on, you addressed me, so under Robert's Rules, I have to add to what you said. You mentioned last year's code of conduct, so just so you know, Chair Scott, as Dr. Fletcher knows, I said I will sign that thing as soon as the Chair of the Board and other members, including members of the administration, including the general counsel, would kindly sit down with me and compare the Miller Chevallier report and point out where the actual violations of the code are so I could learn from that and make sure I wouldn't repeat them, but interestingly enough, no one ever took me up on that offer, so I didn't know if you knew that or not. It's good for you to know.

Roll Call Vote

Trustee Bahar-Cook—Yes
Trustee Balow—No
Trustee Denno—No
Trustee Knake-Jefferson—Yes
Trustee Pierce—Yes
Trustee Scott—Yes
Trustee Tebay—Yes
Trustee Vassar—No

**THE BOARD VOTED to approve** to approve the recommendation.

3. Personnel Action

Trustee Pierce provided the following comments.

Thank you. Let me say that President Guskiewicz has not requested any changes in the code of ethics. He has not requested any changes in his compensation. He has not requested any extension of his contract. We do know, however, that he is being aggressively pursued, which I mentioned earlier, and we intend to ensure we retain Kevin Guskiewicz as the president of Michigan State University, and here's what it's based on. His exemplary performance over the last two plus years, we just, the entire board has seen and reviewed, his performance is well documented. The performance evaluation has been distributed to all of the board members, along with his most recent, the most recent, peer comparables, which we have, we feel now is the time to raise his compensation and extend his contract. We do not want to wait. We feel the urgency of the pursuit for Kevin Guskiewicz by others. Once we have an agreement, this is not approving the contract. Once we have an agreement, we'll work diligently on sources outside of the general fund of MSU for the additional annual compensation. Let me say that again. Once we have an agreement, because he does not know what's coming. Once we have an agreement, we'll work diligently on sources outside the general fund of Michigan State University for the additional annual compensation that we are recommending. And now I'd like to read the resolution, if I can, if I can find it. Okay, hold on. Now I'm losing my internet. All right.

Be it resolved that the Board of Trustees hereby authorizes the following revisions to the first amended President's employment contract for Dr. Kevin Guskiewicz, subject to the finalization of a second amended employment contract, an extension of President Guskiewicz's appointment to March 4, 2031, previously was March 4, 2029 so extending it by two years, an annual base salary of $2 million, previously, it was $1,029,210, an annualized unvested employer award of $250,000. Previously, it was $200,000 per year.

Be it further resolved that the Chair of the Board of Trustees and the Chair of the Budget and Finance Committee, so that would be Brianna Scott as the Chair of

the Board and Sandy Pierce as the Chair of the Budget and Finance Committee, are authorized to finalize the terms of a second amended employment contract with Dr. Guskiewicz, in consultation with the full board. Be it further resolved that the chair of the board of trustees is authorized to execute any documents necessary to effectuate this action. Sorry, I'm losing my voice. That's it, Brianna.

Trustee Balow provided the following comment.

Can we ask questions?

Trustee Scott provided the following comment.

We would call for support to the.

Trustee Balow provided the following comment.

Hold on, before we do that. If we have questions on what she just read, is it appropriate for that now or.

Trustee Scott provided the following comment.

No it's not.

Secretary Fletcher provided the following comment.

During discussion.

Trustee Balow provided the following comment.

Ok.

Trustee Pierce **moved to approve** the recommendation, with support from Trustee Bahar-Cook.

Trustee Balow provided the following comments.

Well, thank you. My, well, just a question, and I think, I know the answer, but I just have to be sure, like, and I emailed you guys beforehand on this. The thought, in terms of the increase in the salary and hitting the general fund, you obviously stated, Trustee Pierce, that efforts are going to be made, but we're not - there's no guarantee in that resolution tonight that it's not going to hit the general fund, correct? We weren't able to do that.

Trustee Pierce provided the following comments.

That's because that's correct, but let me say why, if you don't mind. The reason why is because he doesn't even know that this is coming, and these amounts are coming, and I can't go to sources outside of the general fund until this was made public. But I fully intend, Mike, as I said earlier to you, that there is my full intention is, listen, I'm the Chair of the Budget and Finance Committee, I understand what is going on inside with all the cost cutting efforts and what we're trying to protect, so I fully intend, with the help of the other trustees, to approach sources outside of the general fund. I just can't commit to it, because I haven't done it yet.

Trustee Balow provided the following comments.

I respect what you're doing, and I appreciate it. I'm just trying to get at the governance piece here. If you're not completely successful, does this come back to the board to make that decision, or tonight, leaving here tonight, do we leave open the possibility that part of his raise will come from the general fund? I'm trying to, I know what you're doing, but I'm trying to establish what the resolution is saying.

Trustee Pierce provided the following comments.

I will, I will commit to you that we will come back to the board. We will come back to the board if I can't get this done, with the help of the other trustees. I don't want to do it by myself.

Trustee Balow provided the following comment.

Okay, so then there would be another meeting and resolution if it doesn't turn out the way you intend?

Trustee Pierce provided the following comment.

I'm happy to do that, for this section.

Trustee Balow provided the following comment.

Oh yeah, all right. That, that was my... hold on one second. I mean, that was my question. I'll let someone else go first, but I had some other thoughts. I don't want to hog the microphone.

Trustee Balow provided the following comments.

Well, then, I have, then I'll go again. I was giving someone else a chance. My thoughts are, I want to explain, if the vote's coming, I want to explain my vote on this. I, too, think Kevin is doing a really good job. Like, I feel like I've got a really good relationship with him. I was on the phone with him yesterday for an hour when he was driving to Grand Rapids. The issue that I have here is, we've been playing

a little bit of a game of telephone between the president and the board, and you know it's been a little bit less than comfortable. You know, I emailed and texted him this morning to try to say, where are you at? What do you need? Didn't hear, he's probably on the road somewhere. My feeling was, we, all eight of us, deserve to hear from him directly on this, that didn't happen, so I get it. You know, this is on the agenda tonight. I wish it wasn't. I wish we had a couple more days, but my vote is conditioned on a couple things, like we're making a big financial commitment. Hopefully, it's going to come from the donor community. I wish we had better information, I do. And you know there's something about the governance principles too, like, as good of a job as he's doing. When we talked about governance principles, I've told him this directly, like that's a two-way street. Like, we, we approach the administration through him, you know, that's clear. That's what I've always done. We need information. I told him, just give me the free flow of information, and that's all I ask for to make my decision. And you know, the one example, which we're still dealing with, you know, on December 12, when we were voting on the possibility of the private media investment, you know, I clearly asked the general counsel at the time to provide all of the documents related to that investment, so that I could cast an informed vote, and they did not get that, and you know, I couldn't get the board and the president to force that. I mean, at the time, there was no entity called Spartan Ventures or Spartan Media Ventures, all the hands, all the documents were in the hands of our general counsel, who reports to the president. So there are things we need to work on in terms of the governance principles that cut both ways. But you know, related to him staying here, I certainly hope he does, I mean, he's had a lot of successes. It's a good thing, but you know, we'll do the best we can, but I do not feel I can support the resolution tonight in its current form, and given the lack of information that I had, but that's in no way a verdict on not supporting him. I think if this was done a little bit differently and handled a little bit differently by our board leadership, I might feel better about it, so that's why I'm a no vote tonight. Thank you.

Trustee Pierce provided the following comments.

Okay, what I want to say is that I just agreed that I would come back to the board if we are not able to have a source of funds outside the general fund of Michigan State University. I also want to respond to your comment about Spartan Ventures. I think I said it at the board meeting when we approved Spartan Ventures. I'm very supportive of the structure. I've seen that type of structure, but not at the, in the higher education space before. And I signed the NDA without any fear, and I am going to be at Michigan State University all day on Tuesday to do a deep dive into everything. There's, there's no, there's absolutely no reason any of us cannot go and get all of our questions answered and do a deeper dive. By the way, I have no interest in sharing the structure and how it all works with the competitors. That's why it's under an NDA.

Trustee Vassar provided the following comments.

So, I just want to clarify one point. We voted on Spartan Media Ventures, but we didn't, we didn't vote on the structure because we just didn't have more information about it, and that was my no vote. It wasn't because I didn't think that innovation isn't important, that the Athletic Department doesn't need extreme assistance, and that I wasn't grateful to Dawn and Greg Williams. All of those things are true. I did not know what the structure was going to be, so that vote was not on the on the nonprofit or the NDA. The vote was before that even occurred. I just want to make sure that I clarify the timeline for that. I want to be precise about what's actually happening, though, because I do think it's been, I don't think it's been stated plainly enough, for the record, I do believe, and I've said it over and over for the last four days, that we should wait, as Trustee Balow said, we should just wait and go through the process for both of these items. I still am not sure what the rush was. The board is being asked to approve a compensation increase to $2 million per year for the president of Michigan State University. We have not seen an active offer. We have not consulted the president about whether he wants this increase, as Trustee Pierce said. We do not know with certainty where the money will come from, and the general counsel of this university, the same Brian Quinn, whose co-authorship of today's ethics code I've already addressed, has acknowledged that this is not standard practice by which employment contracts are executed. This just does not happen. You go, you talk, you confer with the person who you're trying to retain, you come back, and you negotiate again, and you come back, and then you draw a contract, and then we, the board, decide on what it is. I want to pause on that. Our own lawyer told us that this is not how it's done, and here we are doing it anyway. Earlier today, I spoke with President Guskiewicz directly. He told me clearly and without hesitation, that he absolutely wants to stay at Michigan State University. I take him at his word. I respect that commitment. It also means that there is no competition, there's no competitive pressure driving this vote. We are not racing a counteroffer, we are not retaining a president who was walking out the door. He is happy here; people are happy with him. There's, he wants to stay. We are competing against ourselves, manufacturing urgency where none exists, and doing so without the basic due diligence that any responsible board would require before approving a contract of this magnitude. Trustee Pierce has suggested the increase be funded through donor contributions. Trustee Denno has identified a conflict of interest in that arrangement. The public has already paid more than $500 million in the last decade alone because of failures of governance and institutional accountability at Michigan State. This board should not be cavalier about where money comes from, how it's promised, and to whom it creates obligations. We have also recently learned that this university went over budget on a building project, the fact that is now part of the public record and part of the public's assessment of this administration's fiscal stewardship. I raise it not to relitigate it, but to note that this is precisely the wrong moment to signal that fiscal discipline is optional when the president's compensation is at stake. Higher education is in a moment of profound financial pressure. Institutions across this country are cutting programs, laying off staff, letting faculty go, and asking students to absorb more cost. The president's own evaluation acknowledges the need for financial resilience and cost control, and I agree with him, which is why I believe

that a fiscally responsible president, one who has said he wants to stay, who's not necessarily facing any competing offer that we have seen, and whose own lawyer has said this process is irregular, deserves a board that does it correctly, not quickly, correctly. My record on this board has been consistent. I raised concerns about the board voting to give authority to enter deals the full board is not reviewed. Now that arrangement that we, that, that we continue to talk about, has within it NDAs. We can't, we can't do any note taking under threats of fines of $250,000 per breach. We have, we have to have a private sector basically running our public institution, right, I'm big on transparency. Said it over and over and over again. I'm not, again, I'm competitive too, so I don't necessarily, Trustee Pierce, I wholeheartedly agree with you. Do not give the playbook away to other schools, and yet those of us who need to know should know without any problems, without any barriers or blockades. This vote is not transparent, it's not procedurally sound. It was not preceded by a conversation with the employee whose contract is being modified and is being taken on the same day as a vote to restrict the speech of the trustees most likely to ask why. I am voting no, not because President Guskiewicz is not produced results, and not because I believe he is undeserving of competitive compensation reviewed through a proper process. I am voting no, because this board owes him and the public better than this. If the majority passes this today, which I'm sure you will, I would ask President Guskiewicz directly and, on the record, do you accept this increase? Do you accept the funding mechanism as proposed? And do you believe this process reflects the governance standards you yourself have championed. The record should include his answers.

Trustee Pierce provided the following comments.

It's hard for me to even believe that what, what was just said. I've done deep analysis on the comparables, I've talked to President Guskiewicz. He's very, very frustrated with the behavior of some of the trustees, he's at wits end. He is physically sick from the stuff going on outside of this university, he, we've all, all of you have seen the, all the trustees have seen his performance review. Do I need to go through it? I'm happy to go through his performance review in public, I am happy to. I'm not sure what else you need. We know that he is being aggressively pursued. This is an attempt to get in front of it, and then to negotiate the details. So, yes, is it unusual? That's what happens when people are at risk, and President Guskiewicz is at risk. He's told me that, so that's all I have to say.

Trustee Bahar-Cook provided the following comments.

Yeah, I'm just going to echo some of what Sandy said, right? Like, I do think he is at risk of leaving if he's actively being pursued by another university. I mean, they're going to know what our contract is now. It's been public, and I have said repeatedly to students and to alumni, you know, when they ask me, you know, what do I think the number one thing, what's the most important thing for MSU right now, and that is that is keeping our president here, so that we can continue to move forward. I would hate to think that we would not pass this tonight, and then you know, who

knows what he would do, but if he did leave, and we didn't pass this tonight, that would be on us. If we pass this tonight, and you know, he, he decides to do whatever he wants to do, that's up to him, but we will have done absolutely everything we can, um, to sort of incentivize him to stay here, and I think that's really important. I want to, I want him here, I want him to finish a lot of what he has started here that, I fear, would collapse if he were to leave.

Trustee Balow provided the following comments.

Yeah, good points, as usual, Rebecca. It's a tough one, right? Like, because you're dealing with the most, well, you know, we're everyone's important, right? But it's the university president these days is an important position. It's a very hard job managing all the constituencies, no doubt. You know, heavy is the head that wears the crown, as they say, and there's a lot expected about the employee that has those responsibilities and those, those privileges. You know, we talked about this last year, and in the meetings this week, you know, one of the trustees made a comment that either he or others thought last year he was underpaid, which was news to me. You know, as a reminder, last year we increased the comp, gave him the Hannah Professorship, which comes with, I think, a stipend and the title, the housing allowance of the $5,000 a month if he chooses to move out of the Cowles House, which is important, because it's good to have him and his family comfortable wherever they decide to live, you know, and increasing the comp last year in the deferred comp to I think $200,000, so there's no doubt that we did the best we could last year. I feel we put a very good and competitive offer on the table. I mean, this is a big deal. We're doubling it, right? Or we're trying to double it. So, again, I say, and it doesn't take anything away from, see the, and the problem, Sandy, is yes, you did talk to him. Brianna, you said you talked to him. I talked to him yesterday, but this subject never came up. You know, I kind of pinged him for it. So, we all got different messages here, so it's very fair for some trustees to feel like they didn't get the whole picture, you know. I don't think we can, you know, say to those trustees, "Well, just go along to get along." So, I don't think this process was handled as well as it could have been, and I think we're trying to do the best we can right now, and, and that's how I feel, you know. And again with the governance principles, and I hear what you're saying, Sandy, with the with the NDA, you know, that I think that that's not constitutional, and we shouldn't, but I say again, like back in December on the 12th, before we took a board vote on actually not creating the media company, which it should have been, but whatever the heck we did on the 12th, that in theory was a vote on $100 million like there was no talk of NDA's at that time, like all the trustees should have been given all the documents before we were asked to vote on it on that date, and I think that was a fail for our school, and I hope it's never repeated again, and I think we can, we can learn from that. Thank you.

Trustee Vassar provided the following comments.

I'm a little concerned with this conflation. Right, I kept trying to figure out what is what is the rush, but now that I keep hearing over and over behavior, behavior, op-eds, I'm concerned that this meeting is more about the policy than it is about anything else. I want to make that clear. I keep hearing that, and I also want to make clear that a president's job is very difficult. Amen. I'll give you all of that, and an op-ed should not be something that would take a president down, like dissension and conversation should not be that stressful that someone would want to leave. When I talked to, to Trustee Balow's point, when I spoke to President Guskiewicz today, he was in good spirits. He said he loves MSU. He definitely wants to stay, I did not get any "hang dog, Oh, woe is me, I can't believe they keep writing these things." I didn't get any of that. We had a healthy conversation about where our points of tension are. And to the point of the op-ed that I wrote around DEI, and just the dismantling of it, and the treatment of Black students, and particularly BSA that gave the university an opportunity to explain what they had been doing to be more transparent and to address the harm that students said that they experienced over and over again and to his credit President Guskiewicz apologized to those students and to MSUBA and other constituencies who were hurt during that process, who felt like they were in the dark during that process. So, the op-ed actually helped to bridge gaps and to bring people together. I don't see it as something that caused him such, you know, duress that now he's thinking about leaving. And he's, certainly did not say that to me, and I, quite frankly, wouldn't think that any president would be that thin-skinned, honestly, and I'm really concerned now that this is more about policing people's behavior than anything else.

Trustee Bahar-Cook provided the following comments.

I am not voting for this to go along to get along. I am voting for this because it's in the best interest of the university, and I mean that's all. We lose, Kevin... I mean, maybe we won't, maybe he's, you know, doesn't matter if we do this or not, maybe it doesn't, you know, but again I feel that if we don't do this, we don't speak with our vote tonight, we are at risk, and that is not a risk I'm willing to gamble with.

Trustee Scott provided the following comments.

Thank you. I just will add a comment. I didn't know if Trustee Tebay had anything. Okay, alright, I will add a comment. I will echo what Trustee Pierce has stated. I guess the joy of being the chair is part of my responsibility and mine before it was mine, it was Trustee Tebay's, to kind of be that person on call for the president to have the conversations with him concerning his concerns, and I have got to say I 100 percent agree with everything that Trustee Pierce said when she said he was frustrated. I think right now we are being, we're kind of sugar-coating how frustrated Kevin Guskiewicz has been, and what has been taking place behind closed doors. I 100 percent believe that if we do not do what we are doing today, we are at risk of losing him. It has not just been op-eds, and I think that that keeps coming up, but it's been more than op-eds. It has been podcasts, op-eds, inappropriate email

messages wherein he's been disrespected. It has been the way that some of his executive vice presidents have felt, and others in his administration, and probably more than himself he cares about the people that work for him, the people that trust him, who can't protect themselves, or who are too afraid of retaliation to say much. So he has been internalizing all of this for months, and I actually believe this probably started under you, Trustee Tebay. I don't think any of this just started in January, and that has led to what Trustee Pierce has indicated about the knots in his stomach and his health. These are things that we as adults should be absolutely ashamed to hear that we have caused that to any individual, let alone someone who came to this university at a very horrible time in our history. He could have gone anywhere else that he wanted, and today he could go anywhere that he wants to go, but he came to Michigan State on a promise that we would abide by governance principles, and we have not done that. And when I say we, there are some on this board that I am specifically speaking about that have not, and you know who you are, you know what you've done. We don't need to rehash it, but the truth is, is that if we do not do what we are doing today, we have the possibility of losing the best president in this state, and probably this country. He has done some of the most impactful programs and modernized MSU in so many ways in less than three years. I mean, I could go on, the Green and White Council, One Health, Spartan Bus Tour, where he's been all over the state, his civil discourse guidance, his Presidential Speaker Series that he's done, the transfer student success, starting the One Health initiative, the Williams Scholarships, these expanding of the 1855 Professorships. I mean, I could just go on and on about the things that Kevin has done. He brought in a remarkable provost. I mean, I just could go on and on. The money that he has been able to get because of who he is and the faith that our donors and our alumni have in Kevin Guskiewicz, that they are willing to give to the extent that they have, and that we are so far along in our Uncommon Will, Far Better World Campaign. That speaks volumes to the leadership that we are graced with at this university, and you know, I frankly think that we should be, rather than arguing about, you know, why this is happening, we should be arguing about what can we do to be better, so that we can help him along the way of doing all of the things that he has in store and planned for this university, but instead people are, it's all about you or us as individuals. We're not here about ourselves, we're not here about our own individual prosperity or our own individual recognition or political clout, or whatever it is, we are here as fiduciaries of this university, and we owe it. If you love this university, like everybody claims that they do, then we owe it to this university to keep this president. Because I'll tell you what, Kelly Tebay, how many presidents have we been through? And I can't imagine if we lose Kevin, anybody's going to be lining up to come here, given the issues that we've had. And there will be a domino effect if we lose Kevin Guskiewicz that I don't think any of us want to see or be a part of. And so, with that, I will just end the discussion. I will ask Stefan if he will please do a roll call vote. If you're going to vote no, vote no, but I am voting yes, because this is not a risk I'm willing to take.

Roll Call Vote

Trustee Bahar-Cook—Yes
Trustee Balow—No
Trustee Denno—Yes
Trustee Knake-Jefferson—Yes
Trustee Pierce—Yes
Trustee Scott—Yes
Trustee Tebay—Yes
Trustee Vassar—Abstain

**THE BOARD VOTED to approve** the recommendation.

4. Request to Adjourn

On a motion by Trustee Scott, supported by Trustee Pierce, **THE BOARD VOTED to adjourn** at 9: 18 p.m.

Respectfully submitted,

Stefan Fletcher
Secretary and Chief of Staff to the Board of Trustees